## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------- x
RASHEA KING,                    :
                                :
        Plaintiff,              :
                                :
                                :
v.                              :
                                :
LINDSEY NESTO, GREGORY REYNOLDS, :
KENROY TAYLOR, MATTHEW VERNIK,  :
PAUL VAKOS, KYLE LISTRO,        :   Civil No. 3:19-cv-1466(AWT)
CHRISTOPHER RINALDI, WARREN     :
WALLER, RYAN PRZYBYLSKI, ERIC   :
EISENHARD, ENRI DRAGOI, ANTHONY :
CAMPBELL, ONTONIEL REYES and    :
CITY OF NEW HAVEN,              :
                                :
        Defendants.             :
                                :
                                :
------------------------------- x
```

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Rashea King brings claims against the City of New Haven and 13 individuals who were at relevant times members of the New Haven Police Department. The Complaint (ECF No. 1) sets forth the following claims: claims pursuant to 42 U.S.C. § 1983 for excessive force, unreasonable seizure, false arrest, and malicious prosecution (Compl. ¶ 34); a common law claim for assault and battery (Compl. ¶ 35); three claims for negligence (Compl. ¶¶ 36-38); and a Monell claim against the City of New Haven, former Chief of the New Haven Police Department, Anthony Campbell, and current Chief of the New Haven Police Department,

-1-

Ontoniel Reyes based on failure to train police officers. <u>See</u> <u>Monell v. Dept. Social Servs. City of N.Y.</u>, 436 U.S. 658 (1978). The plaintiff filed a Motion for Leave to Amend the Complaint, which was granted. However, because the plaintiff never filed an amended complaint, the Complaint continues to be the operative pleading in this case.

Defendants Lindsey Nesto, Gregory Reynolds, and Kenroy Taylor have each filed separate motions for summary judgment. The remaining defendants have moved in one motion for summary judgment. For the reasons set forth below, all of the motions for summary judgment are being granted.

## I.   LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). A non-moving party's failure to oppose a motion for summary judgment does not, by itself, justify the granting of the motion. Where the non-moving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no

material issue of fact remains for trial." Amaker v. Foley, 274
F.3d 677, 681 (2d Cir. 2001). If the evidence submitted in
support of the summary judgment motion does not meet the
movant's initial burden, "summary judgment must be denied even
if no opposing evidentiary matter is presented." Id. (internal
quotation marks omitted); see also Giannullo v. City of N.Y.,
322 F.3d 139, 141 (2d Cir. 2003) (the "non-movant is not
required to rebut an insufficient showing"). However, Federal
Rule of Civil Procedure 56(e) provides that if a party "fails to
properly address another party's assertion of fact as required
by Rule 56(c)," the court may, inter alia, "consider the fact
undisputed for purposes of the motion [or] grant summary
judgment if the motion and supporting materials--including the
facts considered undisputed--show that the movant is entitled to
it."

When ruling on a motion for summary judgment, the court may
not try issues of fact, but must leave those issues to the jury.
See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986). The court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d
33, 41 (2d Cir. 2000)(quoting Del. & Hudson Ry. Co. v. Consol.
Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the
inferences drawn in favor of the nonmovant must be supported by

the evidence. "[I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F. 3d 241, 244 (2d Cir. 2004). The asserted facts "must reference admissible evidence . . . in the record tending to prove each such fact, e.g., deposition testimony, admissions, answers to interrogatories, affidavits, etc." Jackson v. Fed. Express., 766 F.3d 189, 194 (2d Cir. 2014).

The court has reviewed the evidence submitted by the defendants. Because no opposition to the defendants' motion has been filed and the evidence tends to prove them, the court considers the facts asserted in their Rule 56 Statement of Facts admitted. See Fed. R. Civ. P. 56(e)(2).

## II. FACTS

On December 3, 2017, at approximately 7:50 pm, Officer Lindsey Nesto and Officer Gregory Reynolds were dispatched to 226 Ellsworth Avenue in New Haven in response to a "report of a person down." Exh. B, Def.'s L. Civ. R. 56(a)1 Statement (ECF No. 75-2)at 12. Upon their arrival, the officers did not see a person down, but Nesto saw an unknown Black male, who was later identified as plaintiff Rashea King, wearing a green jacket over

a red hooded sweatshirt, walking up and down the sidewalk. King
was throwing his hands in the air and yelling. He walked up to
an occupied motor vehicle, attempted to speak to the driver, and
then walked away. King then continued to pace up and down the
street in an erratic fashion.

King then walked into the middle of the street where he was
obstructing traffic and was almost struck by multiple oncoming
vehicles. Nesto attempted to make contact with King but was
unable to do so. King walked away from Nesto and Reynolds toward
Whalley Avenue, and he appeared to be distraught. Nesto and
Reynolds got into their cruisers and attempted to locate King
but were unable to do so.

Nesto spoke with a witness who informed her that he had
observed King walking in and out of the street and could hear
him talking to himself loudly. The witness reported that King
had walked up to a female and it appeared to the witness as
though King had scared that female.

At approximately 9:18 pm, Nesto, Reynolds, and Officer
Kenroy Taylor were dispatched to the area of Whalley Avenue and
Brownell Street, New Haven in response to a report that an
emotionally disturbed person was running up and down the street.
The individual was described as a Black male wearing a green
shirt, and they were advised that he appeared to be under the
influence of something. When the officers arrived, Nesto saw

that the individual was the plaintiff, and she advised Taylor and Reynolds that it was the same person from the earlier incident on Ellsworth Avenue. The officers observed King walk into Whalley Food Mart, a convenience store at 538 Whalley Avenue. Before the plaintiff entered the convenience store, Taylor told the plaintiff to stop, but he did not do so. Taylor, Nesto, and Reynolds followed the plaintiff into the store.

As the officers entered Whalley Food Mart, the plaintiff was at the counter trying to make a purchase. Officer Taylor asked the plaintiff "You good Bro?" upon approaching him in the store. Def.'s L. Civ. R. 56(a)1 Statement (ECF No. 72-1) at ¶ 9. Nesto asked the plaintiff what his name was and whether he had any identification. King responded that he was trying to buy a lottery ticket for someone and did not give Nesto his name or any identification. Taylor then asked the plaintiff for identification and requested to "take a look at it real quick." Id. The plaintiff reached into his jacket with a confused look on his face and took out his wallet, but he still refused to provide any identification. Taylor concluded that the plaintiff appeared to be intoxicated and was exhibiting symptoms of someone who had used PCP. Nesto reached a similar conclusion.

Instead of providing the officers with identification, the plaintiff turned back toward the store cashier and attempted to resume his transaction. Nesto again asked the plaintiff for

-6-

identification, but the plaintiff ignored her request and reiterated that he was there to buy a lottery ticket.

Taylor then ordered the plaintiff on three separate occasions to turn around. The plaintiff put his hands behind his back, but he did not turn around. Rather, he asked the officers why they were bothering him. Taylor again asked the plaintiff to turn around, and the plaintiff did not comply. When Taylor next asked the plaintiff to turn around, he turned to face the officers, but obscured his hands. Taylor and Nesto then ordered the plaintiff to stay where he was. After another exchange, the plaintiff was directed to turn around and face the wall, but he did not comply. Taylor drew his taser and again ordered the plaintiff to face the wall; again the plaintiff did not comply. At this point, the plaintiff had been ordered approximately 11 times to turn around.

When the plaintiff saw the taser, he told the officers he did want to be tased. Taylor responds, "That is what I'm going to do now, face the wall." Def.'s L. Civ. R. 56(a)1 Statement (ECF No. 72-1) at ¶ 18. The plaintiff did the face the wall. However, the plaintiff removed his hands from behind his back and moved partially behind a nearby cardboard display. He was again ordered several times to turn around and did not comply. Taylor informed the plaintiff, "this is the last time I am going to tell you." Id. at 19. The plaintiff did not comply.

The plaintiff told the officers he was going to get on the floor, placed his hands on his head and lowered his body as if to lie down on the floor but did not do so. Taylor told him to go ahead and do so. However, the plaintiff instead removed his hands from his head and stood upright. The plaintiff then began to remove his jacket, and he was ordered several more times to turn around but did not do so. At this point, Taylor raised his taser but did not discharge it.

Officers ordered the plaintiff approximately six more times to turn around, but he did not comply. Taylor told the plaintiff that he was being given a final warning, but the plaintiff continued to argue with the officers and ignore commands. Taylor then discharged his taser. At this point, one minute and 33 seconds had passed since Taylor first spoke to the plaintiff.

The plaintiff continued not to comply with the officers' commands and was warned that he would be tased again. Nesto and Reynolds then drew their tasers. The plaintiff walked towards the store exit, placing a cardboard phone display between him and the officers. The officers continued to order the plaintiff to turn around, but he did not comply. Taylor told Nesto and Reynolds to not let the plaintiff leave the store. The plaintiff and Nesto began to grapple over the phone display, and Reynolds fired his taser. The plaintiff pulled the cardboard phone display from Nesto's hands as he backed up toward the cash

-8-

register.

After the officers continued to give the plaintiff commands
and warned the plaintiff that he would be tased again, the
plaintiff moved toward the officers using part of the cardboard
phone display as a shield. Nesto deployed her taser, but it was
ineffective. Taylor deployed his pepper spray and ordered the
plaintiff to back up. Taylor again discharged his taser and
ordered the plaintiff to get on the ground.

The plaintiff complained about being tased, but it had no
apparent effect on his ability to remain upright. He continued
to disregard directives from the officers. Then, the plaintiff
jumped onto the store counter. As he attempted to go over the
counter, Reynolds tried to grab him but went over the counter
with him. The plaintiff tried to run from behind the counter,
but Nesto blocked him. The three officers then took him to the
ground in an attempt to place handcuffs on him. The plaintiff
fought with the officers but was eventually handcuffed.

Officer Eisenhard and Officer Dragoi arrived on the scene
as Nesto, Taylor, and Reynolds were attempting to restrain the
plaintiff. Eisenhard did not strike the plaintiff, did not
witness any striking of the plaintiff, and was not present for
any use of a taser or pepper spray. Dragoi did not strike the
plaintiff, did not witness any striking of the plaintiff, and
was not present for any use of a taser or pepper spray.

An ambulance crew was called to the scene to evaluate King because he had been exposed to the tasers and pepper spray. Defendant Sergeant Ryan Przybylski then arrived on the scene. The plaintiff was transported to St. Raphael's Hospital for further evaluation. Defendants Officers Paul Vakos and Warren Waller followed the ambulance.

The plaintiff was charged with two counts of disorderly conduct in violation of Conn. Gen. Stat. § 53a-182 and with interfering with police in violation of Conn. Gen. Stat. § 53a-167a.

**III. DISCUSSION**

**A. Defendants Vernik, Vakos, Listro, Rinaldi, Waller, and Przybylski**

In his Motion for Leave to Amend the Complaint (ECF No. 74), the plaintiff stated that he wished to withdraw claims these defendants. The court treats this motion as a notice of withdrawal of claims against those defendants. In any event, these defendants are entitled to summary judgment because there is no evidence that they were personally involved in any of the incidents that form the basis for the plaintiff's claims.

Therefore, summary judgment should be granted as to these defendants.

**B. Fourth Amendment Excessive Force Claim**

"To establish a Fourth Amendment excessive-force claim, a

-10-

plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." Finnegan v. Fountain, 915 F.2d 817, 823 (2d Cir. 1990) (citing Graham v. Connor, 490 U.S. 397-98 (1990)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F. 2d 1028, 1033 (2d Cir. 1973)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

Here, Nesto and Reynolds had previously been dispatched in response to a report that the plaintiff was creating a disturbance, and the plaintiff had walked away from them. On the second call they were joined by Taylor, who was made aware of the first incident. When the three officers entered Whalley Food Mart, they dealt with an individual who refused to produce identification even when he was repeatedly asked to do so and who refused to obey commands from the officers again and again

and again. The officers had reason to believe that the plaintiff was under the influence of PCP or some other substance and was behaving erratically. The plaintiff was also warned repeatedly that he would be tased before the taser was used. When tasers were used, the plaintiff remained upright after multiple taser discharges. The officers had been unable to control the plaintiff's movements or determine whether he was armed or unarmed. The plaintiff was warned repeatedly before the taser was used. When tasers were used, the plaintiff remained upright after multiple taser discharges.

The plaintiff eventually attempted to leave the store and had to be physically stopped from doing so by the officers. He fought with and had to be restrained by the officers so that he could be handcuffed. Under these circumstances, the particular use of force by Nesto, Reynolds, and Taylor was reasonable from the perspective of a reasonable officer on the scene.

Therefore, the motion for summary judgment should be granted as to this claim.

### C. 42 U.S.C. § 1983 Claims for False Arrest, False Imprisonment, and Malicious Prosecution

"In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." Davis v. Rodriguez, 364 F.3d 424 (2d Cir. 2004); see also Russo v. City of Bridgeport, 479 F.3d 196,

203 (2d Cir. 2007). Under Connecticut law, claims for false arrest and false imprisonment are synonymous; "'[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another.'" <u>Russo</u>, 479 F.3d at 204 (quoting <u>Outlaw v. City of Meriden</u>, 43 Conn. App. 387, 392 (Conn. App. Ct. 1996)).

To prevail on a claim for false arrest, false imprisonment, or malicious prosecution under 42 U.S.C. § 1983, one of the elements a plaintiff must establish in each instance is the absence of probable cause. <u>See</u>, <u>Shattuck v. Town of Stratford</u>, 233 F.Supp. 2d 301, 306-07. "[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." <u>Walczyk v. Rio</u>, 496 F.3d 139, 156 (2d Cir. 2007) (quoting <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996)). Probable cause is "a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules. . . . While probable cause requires more than a 'mere suspicion' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'" <u>Id.</u> (quoting <u>Illinois v. Gates</u>, 462 U.S 213, 232 (1983)(internal citations ommitted)). "[P]robable cause does not require an officer to be certain that

subsequent prosecution of the arrestee will be successful." Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989). See also, United States v. Fisher, 702 F.2d 372, 375) (2d Cir. 1983) ("The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction.").

Here, there was probable cause to arrest and prosecute the plaintiff. The plaintiff was charged, inter alia, with violation of Conn. Gen. Stat. § 53a-167a. Under Conn. Gen. Stat. § 53a-167a, a "person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties." Officers Nesto, Reynolds, and Taylor were lawfully investigating reports of an individual matching the plaintiff's description who had been interrupting traffic and appeared to be under the influence of some narcotic or similar substance. He refused to provide identification to the officers, despite being asked repeatedly to do so. The plaintiff then refused to turn around when directed multiple times to do so and then attempted to flee. He then had to be physically restrained to stop him from fleeing and to enable the officers to place him in handcuffs. Thus, the plaintiff clearly obstructed, resisted, and hindered the officers in the performance of their duty.

-14-

Therefore, the defendants are entitled to summary judgment
as to these claims.

### D. Eisenhard and Dragoi

There is no evidence that either Officer Eisenhard or
Officer Dragoi was personally involved in any of the incidents
that form the basis for the plaintiff's claims. Therefore,
summary judgment should be granted as to these defendants.

### E. Monell Claim

The plaintiff purports to bring a Monell claim against the
City of New Haven as well as defendant Anthony Campbell and
defendant Otoniel Reyes in their official capacities. Section
1983 claims against municipal employees in their "official
capacity" are tantamount to claims against the municipality
itself. See Dwares v. City of New York, 985 F.2d 94, 100 (2d
Cir. 1993), overruled on other grounds by Leatherman v. Tarrant
Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163
(1993).

"In order to prevail on a [S]ection 1983 claim, the
plaintiff must show that the defendant's conduct deprived him of
a federal right." Sykes v. James, 13 F.3d 515, 519 (1993)
(internal citations omitted). "A municipality or other local
government may be liable under this section if the governmental
body itself 'subjects' a person to a deprivation of rights or
'causes' a person 'to be subjected' to such deprivation."

Connick v. Thompson, 563. U.S. 51, 60 (2011) (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692 (1978)). "But, under § 1983, local governments are only responsible for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." Id. (internal citations omitted).

The defendants contend that the plaintiff has made only conclusory allegations with respect to his Monell claim and that there exists no evidence in support of this claim. The court agrees.

While the moving party has the initial burden when seeking summary judgment to show that there is no genuine dispute as to any material fact, see Fed. R. Civ. P. 56(a), under Rule 56(c) a party asserting that there is no genuine dispute as to a fact can rely on a showing that the adverse party cannot produce admissible evidence to support the fact. See Fed. R. Civ. P. 56(c)(1) & advisory committee's note to 2010 amendment, Subdivision (c)(1)(B) ("[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

Therefore, the defendants are entitled to summary judgment on this claim.

-16-

**F. State Law Claims**

Because the court is granting summary judgment on the plaintiff's federal law claims, the court declines to exercise supplemental jurisdiction over his remaining state-law claims. Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . .. if . . . the district court has dismissed all claims over which it has original jurisdiction."

**IV.   CONCLUSION**

For the reasons set forth above, each of the Motions for Summary Judgment (ECF No. 72, ECF No. 75, ECF No. 76, and ECF No. 77) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants with respect to all of the plaintiff's federal claims, and the plaintiff's state law claims are hereby dismissed.

The Clerk shall close this case.

It is so ordered.


Dated this 10th day of March 2023, at Hartford, Connecticut.


                               /s/AWT
                        Alvin W. Thompson
                  United States District Judge
